DECISION ON OBJECTIONS TO MAGISTRATE'S DECISION
{¶ 1} Relator, Mervin E. Leedy, has filed this original action in mandamus requesting this court to issue a writ of mandamus ordering respondent School Employees Retirement System ("SERS") to vacate its order terminating relator's disability benefits and ordering SERS to issue a new order finding that he is entitled to continue to receive said benefits.
 {¶ 2} This court referred the matter to a magistrate, pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals, who issued a decision including findings of fact and conclusions of law. In her decision (attached as Appendix A), the magistrate concluded that SERS had abused its discretion and that this court should issue a writ of mandamus.
 {¶ 3} Respondent filed objections to the decision of the magistrate arguing that the magistrate erred in finding an abuse of discretion by SERS because SERS is not required to state an explanation for its decision. See Copeland v. School Employees Retirement System (Aug. 5, 1999), Franklin App. No. 98AP-1173, cause dismissed, (2000),88 Ohio St.3d 1507, which essentially renders such a determination not reviewable by this court, and, in the alternative, that the examining physicians were sufficiently apprised of relator's job duties to support the decision of SERS. However, as relator noted in his response to the objections, although SERS is not required to state the reasons for its determinations, those decisions are still properly reviewable by this court in mandamus. Further, we agree that the record fails to support SERS' assertion that "each physician was provided a copy of the initial job application, wherein [Relator] answered questions regarding his job duties."
 {¶ 4} Relator also filed an objection to the decision of the magistrate arguing that the magistrate erred in not granting a writ of mandamus ordering the reinstatement of relator's benefits from the date of termination. However, we do not see this case as falling within the purview of State ex rel. Gay v. Mihm (1994), 68 Ohio St.3d 315. The relief provided for under the authority of that case is to be applied only in extraordinary circumstances. Accordingly, the objections of relator and respondent are overruled.
 {¶ 5} Following independent review pursuant to Civ.R. 53, we find that the magistrate has properly determined the pertinent facts and applied the salient law to them. We hereby adopt her decision as our own, including the findings of fact and conclusions of law contained in it. In accordance with that decision, this court issues a writ of mandamus ordering SERS to obtain new opinions from the examining physicians, within the context of a thorough job description of relator's previous employment, with regard to the conditions which were identified as disabling, specifically connective tissue disorder and fibromyalgia. Further, the reviewing physicians of the Medical Advisory Committee in turn must reevaluate the medical evidence based upon the restrictions contained in Dr. Renneker's report, and redetermine the issue of eligibility for continuing disability compensation, where upon SERS should issue a new order reflecting that determination.
Objections overruled; writ of mandamus granted.
Brown, P.J., and Klatt, J., concur.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State of Ohio ex rel. Mervin E. Leedy, :
 Relator, :
v. : No. 04AP-473
School Employees Retirement System, : (REGULAR CALENDAR)
 Respondent. :
 MAGISTRATE'S DECISION Rendered on October 21, 2004 Mowery Youell, Ltd., and Merl H. Wayman, for relator.
Jim Petro, Attorney General, and Emily A. Smith, for respondent.
IN MANDAMUS
 {¶ 6} Relator, Mervin E. Leedy, has filed this original action requesting that this court issue a writ of mandamus ordering respondent School Employees Retirement System ("SERS") to vacate its order terminating relator's disability benefits and ordering SERS to find that he is entitled to continue on disability retirement benefits.
Findings of Fact:
 {¶ 7} 1. Relator was formerly employed as a custodian with the Lima City School System.
 {¶ 8} 2. On November 17, 2001, relator completed and filed a disability retirement application with SERS. On his application, relator briefly described his job position as follows:
Custodian = unloads trucks, lift computer paper boxes copy machine paper boxes. Move boxes for [administration] secretaries up and down stairs. Sweep, mop, buff, etc.
 {¶ 9} 3. Relator's physician, Dr. Warren J. Downhour, certified that relator was disabled due to the following medical conditions: "Connective Tissue Disorder," "Chronic Pain Disorder," and "Small Fiber Peripheral Neuropathy."
 {¶ 10} 4. On November 30, 2001, SERS wrote a letter to the Treasurer of the Lima City Schools requesting information as to relator's last assigned primary job duty within the school system, including a request that a job description be filed with SERS in order to process the application. The treasurer responded on a form by noting relator's job title, his hours, and confirmed that he was not on the payroll. No job description was sent.
 {¶ 11} 5. At the request of SERS, relator was examined by Dr. Nancy M. Vaughan, pursuant to R.C. 3309.39(C). SERS provided Dr. Vaughan with a form indicating the conditions for which relator claimed disability and explained the parameters of Dr. Vaughan's examination of relator as follows:
Disability retirement is in no sense ordinary health, accident or unemployment insurance. It is provided for the school employee whose disability is permanent in character or from which recovery cannot be anticipated within a reasonable length of time. In addition to your specific report applicable to the condition for which disability is claimed, the Retirement Board desires a general summary of the applicant's physical and mental condition as a guide in determining disability. Any reasonable test or consultation necessary to adequately evaluate the applicant's status for determination of permanent disability is permissible; special or expensive procedures such as MRI inquire prior approval. Your fee for this examination will be paid by the Retirement Board. Please submit your statement with the completed report.
(Emphasis sic.)
 {¶ 12} 6. On physical exam, Dr. Vaughan noted the following findings:
Examination of the spine revealed mild thoracic dextroscoliosis. There was tightness and tenderness of the trapezius muscles, thoracic and lumbar paraspinal muscles and R L5-S1 facet region. He had full range of motion of the lumbar spine; however, there was pain at the R L5-S1 facet joint with extension.
He has a normal station and gait. He could walk on his heels and toes. He was able to squat but did have difficulty returning to a standing position. He had slight difficulty doing 10 toe raises on the R but not on the L. Trendelenburg was negative for gluteal weakness.
Light touch was decreased in the R C5 and R L5-S1 distributions. Vibration sense was intact. Reflexes were ¾ at the biceps and triceps, ¼ at the brachioradialis, ¾ at the patella and Achilles, 2/4 at the hamstrings. He did have a positive L Hoffmann's. Toes were downgoing and there was no clonus. Manual muscle testing revealed 5/5 strength throughout the upper and lower limbs.
Circumferential measurements of the arms R 31cm and L 30cm; forearms R 28cm and L 27cm; thighs R and L 42 cm and calves R 38.5cm and L 38.0cm. There was no muscle atrophy noted. There was tenderness with palpation of all tender points. There were no rashes. He did have very dry skin. There was no joint swelling. He did have tenderness of the 1st CMC joints.
 {¶ 13} Thereafter, Dr. Vaughan noted her impression and recommendations as follows:
IMPRESSION:
1. Connective tissue disease likely causing his intermittent weakness, elevated CK, dry eyes and mouth.
2. Small fiber neuropathy causing autonomic disturbance and burning pain.
3. Depression.
RECOMMENDATIONS:
His job as a custodian involves frequent heavy lifting of supplies and furniture. This is difficult with a connective tissue disorder which waxes and wanes. Strenuous lifting during an acute flare can worsen the myopathic condition. It is my opinion that he is not physically capable of performing his duties as a custodian due [to] his connective tissue disorder. His small fiber neuropathy is causing pain and autonomic symptoms, but itself is not disabling.
 {¶ 14} 7. By letter dated January 30, 2002, Dr. Edwin H. Season, Chairman of the Medical Advisory Committee ("MAC"), notified relator that MAC was recommending that he be granted disability retirement benefits as follows:
The examiner for SERS has certified that the member is disabled. Based upon this information, the Medical Advisory Committee recommends that the member be granted disability retirement benefits for the condition of connective tissue disorder. We recommend that a reexamination be performed in approximately one year.
 {¶ 15} 8. By letter dated February 6, 2002, the executive director of SERS notified relator that his application for disability retirement had been approved and that he would be scheduled for a reexamination in approximately one year.
 {¶ 16} 9. By letter dated January 7, 2003, SERS notified relator that his disability retirement was currently under review and requested that he contact his physician's office and authorize them to release medical information from the previous year. Furthermore, relator was informed that he may be scheduled for an examination.
 {¶ 17} 10. Relator submitted the office records of Dr. Downhour as well as the December 6, 2002 report of Dr. John B. Siegler. In his report, Dr. Siegler noted the following relevant findings:
* * * Examination of his posture reveals rounding of the shoulders and loss of cervical lordosis. He does have hyperlordosis of lumbar spine present. An anterior pelvic tilt is present. He has good range of motion if [sic] his lumbar spine with flexion, extension and lateral bending. He also has excellent range of motion with flexion, extension, lateral bending and rotation of his cervical spine. He has diffuse pain with palpation of his upper trapezius muscles, costochondral area, lumbar spine, medial gastroc and brachioradialis insertion. Having at least 16 of 18 fibromyalgia trigger points * * * is also indicative of fibromyalgia * * *.
The patient's musculoskeletal exam reveals he has full strength with grip, wrist flexion, wrist extension, elbow flexion, elbow extension, and shoulder abduction. He has full strength with hip flexion, knee flexion, knee extension, dorsiflexion and plantar flexion. * * *
Seated slump test did reproduce concordant pain down his right lower extremity as did straight leg raise. * * *
 {¶ 18} Dr. Siegler noted the following diagnoses: "1. Fibromyalgia. 2. Chronic right L4 radiculopathy. 3. Prizmals angina. 4. Hip flexor tightness. 5. Iliotibial band tightness. 6. Deconditioning." Dr. Siegler noted further that, based upon his neurological exam, there was no evidence of neuropathy. Dr. Siegler recommended treatment with a tricyclic antidepressant and a PERC multi-disciplinary pain program.
 {¶ 19} 11. Relator was scheduled for a medical examination with Dr. Marvin H. Thomas, specifically with regards to the condition of "connective tissue disorder." In his March 11, 2003 report, Dr. Thomas noted the following relevant physical findings: "The musculoskeletal examination revealed no abnormalities on the joint exam. I cannot demonstrate definite muscle weakness. He does have many tender points of fibromyalgia." Under the impression section, Dr. Thomas noted the following: "Clinically, he appears to have fibromyalgia with apparent elevation of CPK in the past, but no evidence of an inflammatory muscle disease. It is not likely that the CPK is clinically significant. There is no evidence of autoimmune rheumatic disease." Thereafter, following receipt of the laboratory studies, Dr. Thomas notified SERS as follows: "Aside from fibromyalgia, I can find no evidence of any other rheumatological disease. There is no evidence now even by laboratory of inflammatory muscle disease. I find no rheumatological basis for disability."
 {¶ 20} 12. SERS scheduled relator for a medical examination with Dr. Richard H. Clary, requesting that he examine relator for the condition of "anxiety."
 {¶ 21} 13. In his report dated May 21, 2003, Dr. Clary concluded as follows: "In my medical opinion, the panic attacks are not work prohibitive and do not cause long term disability."
 {¶ 22} 14. SERS scheduled relator for another medical examination with Dr. Terry L. Irwin, and requested that Dr. Irwin examine relator for the following conditions: "spasmodic angina, reflux, spastic colon."
 {¶ 23} 15. Dr. Irwin noted the following impressions and recommendations:
IMPRESSION:
1. Chronic fibromyalgia.
2. History of chest pain with normal coronary arteries and possible Prinz-metal angina.
3. Gastroesophageal reflux disease.
4. Irritable bowel syndrome (spastic colon).
RECOMMENDATIONS:
With respect to the diagnoses of spasmatic angina, reflux esophagitis, and spastic colon I do not believe that this patient should be considered totally and permanently disabled. These conditions in this patient are not of sufficient intensity to prevent his employment at his current job description.
 {¶ 24} 16. Thereafter, relator's medical records and the reports gathered pursuant to the examinations were forwarded to three doctors on MAC who were asked to render their opinions with regards to relator's continued disability. Following review of the medical data, Drs. Timothy J. Fallon, Charles F. Wooley, and Marjorie C. Gallagher, concluded that relator was not permanently incapacitated from the performance of his usual duties as a custodian and is capable of resuming his usual duties and recommended that his disability benefits should not be continued.
 {¶ 25} 17. By letter dated July 30, 2003, Dr. Edwin H. Season recommended, on behalf of MAC, that SERS terminate relator's disability retirement.
 {¶ 26} 18. By letter dated September 22, 2003, relator was informed as follows:
On September 19, 2003, the Retirement Board took formal action to terminate disability benefits. Your monthly pension and health care coverage will be terminated no later than December 31, 2003.
If you intend to appeal the Board's decision it must be in writing, signed by you, and sent within 15 days of the date of this letter. Please follow the instructions in the enclosed leaflet regarding School Employees Retirement System's disability appeal procedure.
 {¶ 27} 19. By letter received by SERS on September 29, 2003, relator indicated that he was appealing the board's decision to terminate his benefits.
 {¶ 28} 20. By letter dated September 30, 2003, relator was informed that additional medical evidence must meet the following requirements: be current in relation to the disability claimed on the application; consist of information not already considered by SERS; and be received no later than December 21, 2003.
 {¶ 29} 21. In response thereto, relator submitted the December 16, 2003 letter from his attorney, Merl H. Wayman, and the December 5, 2003 report of Dr. Nancy Renneker. In his December 16, 2003 letter, attorney Wayman pointed out the following relevant information:
Based on the above diagnoses and residual impairments, Dr. Renneker reviewed the Lima City Schools job description to determine whether Mr. Leedy's residual capacity would permit him to perform his job duties (Exhibit 3). Upon reviewing the job description, Dr. Renneker concluded that Mr. Leedy (1) was unable [to] lift objects weighing up to 70 lbs., (2) was unable to operate motorized equipment if he has taken Ultracet within 2 hours of operating the equipment, (3) could not sweep, scrub, wax and maintain all school floors, (4) was unable to climb ladders, (5) was unable to wash windows or walls with either arm and [6] could not unload supplies that weighed more than 15 to 20 lbs. In sum, Dr. Renneker concluded that Mr. Leedy was permanently and totally disabled from performing the essential job tasks of a Lima City School Custodian.
Notwithstanding the above, SERS retained the following physicians to re-evaluate Mr. Leedy's claim: psychiatrist Richard Clary, M.D., Gastroenterologist Terry L. Irwin, M.D., and Rheumatologist, Marvin Thomas, M.D. Their findings should be discounted for two reasons. First, none of these physicians indicated that they were familiar with Mr. Leedy's position and job duties. Second, two of these physicians evaluated conditions which were never known to prevent him from performing his job duties. Their reports are, therefore, irrelevant.
On November 30, 2001, SERS mailed a letter to the Treasurer of the Lima City Schools and asked for a copy of a "detailed job description (Exhibit 4)." But the job description was never submitted to SERS as requested. For the first time, the job description was submitted to Dr. Renneker, and subsequently, to SERS to support this appeal (Exhibit 3). Drs. Cleary [sic], Irwin or Thomas never had the opportunity to review it. Only Dr. Renneker reviewed the job description and compared its requirements to Mr. Leedy's residual capacities. Her evaluation must, therefore, be given stronger weight and credibility.
Although SERS retained Dr. Irwin to evaluate a previous gastroenterological condition, Mr. Leedy never claimed he was disabled because of such a condition. Similarly, he was not found disabled due to a psychiatric condition. For these reasons, the reports of Drs. Clary and Irwin are irrelevant.
 {¶ 30} 22. In her December 5, 2003 report, Dr. Renneker noted that relator complained of the following:
* * * (1) constant bilateral low back pain, constant stiffness about low back, non-constant, but daily radiation of pain/paresthesis down posterior right thigh to knee, right lateral shin extending into right foot, with Mr. Leedy reporting constant numbness about right great toe[;] (2) greater than 2 hours of total body stiffness on waking, easy fatigue, lack of refreshing sleep, aggravation of "total body achiness" in cold or damp weather, when exposed to loud noises, and with over-exertion[;] (3) constant pain about apex of bilateral shoulders, constant stiffness about both shoulders, with Mr. Leedy reporting that he notes more stiffness in his left shoulder. Mervin Leedy is unable to lie on his left shoulder-left side for sleep due to increased left shoulder pain with this activity and Mr. Leedy reports that he has difficulty reaching above horizontal with his left arm[;] (4) weakness about bilateral arms and both hips, with Mervin Leedy reporting that he has difficulty with lifting, when attempting to push or pull and Mervin Leedy reports that he has difficulty getting up from a chair if he is sitting in a low chair and Mr. Leedy reports that he must use his arms on the armrest of chair to assist him with going from sitting to standing posture[;] and (5) Mervin Leedy notes decreased left grip strength since the development of Dupuytren's contracture in left hand.
 {¶ 31} With regard to her physical examination, Dr. Renneker made the following relevant findings:
* * * (4) 16 out of a possible 18 tender points are noted with respects [sic] to the diagnosis of fibromyalgia[;] (5) bilateral positive jump signs are also seen[;] and (6) Dermographism is noted. Active neck range of motion: flexion 30 degrees, extension 20 degrees, right neck rotation 60 degrees, left neck rotation 30 degrees, left neck lateral flexion 15 degrees, and right neck lateral flexion 30 degrees, with paravertebral muscle spasm noted on active neck range of motion. Active right shoulder range of motion: flexion 150 degrees, extension 40 degrees, abduction 140 degrees, adduction 30 degrees, external rotation 50 degrees, and internal rotation 20 degrees. Active left shoulder range of motion: flexion 120 degrees, extension 30 degrees, abduction 120 degrees, adduction 20 degrees, external rotation 50 degrees, and internal rotation 10 degrees. Passive bilateral shoulder range of motion corresponds with the above listed active shoulder range of motion measurements. Full active range of motion is noted at bilateral wrist and throughout bilateral hands. Bilateral upper extremity strength, deep tendon reflexes, and sensation are within normal limits with the exception of: (1) 4/5 strength is noted throughout bilateral shoulder[;] (2) 4-/5 strength is noted throughout left wrist and hand, including left hand intrinsic muscles[;] (3) decreased left grip with increased strength loss index. Normal left (non-dominant hand) grip strength in a 43 year old male equals 47 kg; Mervin Leedy's average left grip in 3 trials equaled 15 kg and this corresponds to a 68% strength loss index[;] and (4) decreased right grip with increased strength loss index. Normal right (dominant hand) grip strength in a 43 year old male equals 49 kg; Mervin Leedy's average right grip in 3 trials equaled 36 kg and this corresponds to a 27% strength loss index.
Active right hip range of motion: flexion 90 degrees, a 15 degree right hip flexion contracture is measured, internal rotation 20 degrees, external rotation 30 degrees, abduction 20 degrees, and adduction 15 degrees. Active left hip range of motion: flexion 90 degrees, a 10 degree left hip flexion contracture is measured, internal rotation 20 degrees, external rotation 30 degrees, abduction 25 degrees, and adduction 15 degrees. Active lumbar spine range of motion: flexion 30 degrees, with a 25 degree sacral flexion angle, extension 0 degrees, right lumbar lateral flexion 10 degrees, and left lumbar lateral flexion 15 degrees, with paravertebral muscle spasm noted on active lumbar spine range of motion. Of note, Mr. Leedy goes from the flexed position of his lumbar spine to lumbar extension by placing palms of hands on anterior aspect of each thigh and "walking up his thighs with his hands". Right passive straight leg raise test is possible to 35 degrees of right hip flexion and Mr. Leedy notes an increase in low back, right buttock, right groin, and right posterior thigh to knee pain with this test. Left passive straight leg raise test is possible to 45 degrees of left hip flexion and Mr. Leedy notes an increase in low back and left buttock pain. Bilateral lower extremity strength, deep tendon reflexes, and sensation are within normal limits with the exception of: (1) 4/5 strength is noted in bilateral hip flexors[;] (2) 1+ right ankle deep tendon reflex[;] and (3) 4-/5 strength is noted in right EHL. Heart has a regular rate and rhythm with no murmurs, gallops, nor rubs appreciated and lungs are clear to auscultation and percussion.
 {¶ 32} Dr. Renneker opined as follows:
Mervin E. Leedy has the following musculoskeletal diagnosis and associated impairments: (1) fibromyalgia with more than 2 to 3 hours of morning stiffness, easy fatigue, lack of refreshing sleep and with increased pain and stiffness with over-exertion[;] (2) connective tissue disease with intermittent, i.e., waxing and waning weakness about proximal muscles, i.e., bilateral hips and bilateral shoulders, elevated creatine kinase, dry eyes and mouth[;] (3) small fiber neuropathy, which adds to Mervin Leedy's proximal weakness[;] (4) chronic pain disorder, not controlled with current medications, with Mr. Leedy describing his pain on a good day as a 6 on a visual analog scale of 0 to 10, with 10 being worse pain in a lifetime and 0 being no pain. Mervin Leedy states that at times, his pain is at a level 8, at which he is severely limited in his physical activity despite being on Ultracet, oral long-acting Morphine, Neurontin, and Vioxx[;] (3) chronic right L4 and right L5 radiculopathy with limited active lumbar spine range of motion, weakness in right L5 myotome, i.e., weakness in right great toe extension and Mervin Leedy complains of a "numb right great toe"[;] (4) bilateral shoulder adhesive capsulitis and bilateral shoulder tendonitis, with Mervin Leedy unable to use either arm above horizontal and Mr. Leedy is unable to push or pull with either arm[;] (5) mild left hand Dupuytren con-tractures with decreased left grip strength[;] and (6) bilateral hip flexion contractures.
Based on the above diagnosis and residual impairments, it is my medical opinion that Mervin E. Leedy is unable to perform the listed essential task of a school custodian, i.e., Mervin Leedy is unable to perform the required heavy lifting of that job, i.e., able to occasionally lift objects weighing up to 70 lbs. In addition to that restriction, Mervin Leedy is unable to operate motorized equipment if he has taken Ultracet within 2 hours of operating motorized equipment, nor is he able to sweep, scrub, wax, and maintain all school floors and Mervin Leedy is unable to climb ladders in order to change light bulb fixtures, unable to wash windows or walls with either arm and Mr. Leedy is unable to unload supplies that weigh more than 15 to 20 lbs. As such, it is my medical opinion that Mervin E. Leedy is permanently and totally disabled from performing the essential job tasks of a Lima City School Custodian.
 {¶ 33} 23. Drs. Fallon, Wooley, and Gallagher, were asked to reconsider whether disability benefits should be terminated after reviewing the additional medical evidence submitted by relator. Dr. Fallon specifically noted as follows in his January 5, 2004 response:
I reviewed the letter from Mr. Wayman, as well as the additional information from Dr. Kistle, who indicated a recommendation for increasing one of his medications. His physical examination did not reveal any weakness or neurologic abnormality and suggested fibromyalgia. Dr. Downhour indicates fibromyalgia as being this gentleman's problem.
Dr. Renneker felt he was disabled and cited limitations regarding his L4 and L5 radiculopathy on the right with weakness in an L5 distribution.
After reviewing this information, it is my medical opinion that a second independent medical evaluation, namely a physiatric evaluation, should be obtained to determine this gentleman's current status, particularly in regards to his fibromyalgia and radicular symptomatology.
 {¶ 34} 24. In his January 8, 2004 report, Dr. Wooley simply reiterated that he agreed with Drs. Thomas, Clary, and Irwin, that relator is not permanently incapacitated at this time.
 {¶ 35} 25. In her report received January 26, 2004, Dr. Gallagher noted as follows:
* * * Dr. Nancy Renneker, M.D., in her medical evaluation, dated December 5, 2003, diagnoses fibromyalgia, connective tissue disorder, small fiber neuropathy, chronic pain disorder, chronic right L4 and right L5 radiculopathy, bilateral shoulder adhesive capsulitis and tendonitis, mild left hand Dupuytren contractures and bilateral hip flexion contractures. Dr. Renneker opines that Mr. Leedy is unable to perform the listed essential tasks of a school custodian because he is unable to perform the required heavy lifting of objects weighing up to 70 lbs. She also opined that he is unable to operate motorized equipment after taking Ultracet, and is unable to sweep, scrub, wax, or maintain the floors, climb ladders in order to change light bulbs, or wash windows. Dr. Renneker indicates that Mr. Leedy's connective tissue disorder results in intermittent proximal muscle weakness, dry eyes and mouth. In her physical examination, Dr. Renneker does not note significant muscle weakness in Mr. Leedy's proximal muscles.
After review of the additional information, there is no objective information provided that would result in a change of my original opinion regarding Mr. Leedy's disability determination. It remains my opinion that Mr. Leedy is able to return to work as a custodian and his disability retirement should not be continued.
 {¶ 36} 26. Thereafter, in a report dated February 25, 2004, after MAC met in special session, Dr. Fallon reconsidered his opinion and determined as follows:
He had submitted additional information which included a report from Dr. Rennicker [sic] stipulating a 70 pound weight restriction, and for that reason it was felt that the medical advisory committee should discuss this to make a final determination. Following extensive discussions, it was noted that this gentleman's job description did not indicate lifting greater than 70 pounds and as that was not an issue, it was felt that this gentleman's overall status was such that he would be considered not disabled and could continue in work activity at this time as a custodian.
 {¶ 37} 27. Thereafter, Dr. Season recommended that SERS stand by its original decision to terminate relator's disability retirement and recommended that relator's appeal be denied.
 {¶ 38} 28. By letter dated March 22, 2004, relator was informed that, on March 19, 2004, the retirement board upheld their original decision to terminate his disability retirement.
 {¶ 39} 29. Thereafter, relator filed the instant mandamus action in this court.
Conclusions of Law:
 {¶ 40} The issues raised in this mandamus action are the same issues which relator raised in his appeal before the SERS board. Relator contends that SERS abused its discretion by terminating his disability retirement benefits based upon the reports of medical examiners who did not consider his job duties or the physical demands of his former position and who failed to base their opinions, regarding disability, upon a consideration of the conditions for which relator's disability was claimed. Furthermore, relator argues that the physicians of MAC who review the medical evidence and provide a recommendation for the SERS board misconstrued Dr. Renneker's physical restrictions.
For the reasons that follow, this magistrate finds that this court should issue a writ of mandamus in this particular case.
 {¶ 41} Relator applied for disability coverage under R.C. 3309.39. Pursuant to R.C. 3309.39 and Ohio Adm. Code 3309-1-40, relator submitted his application on the form provided by the board and underwent a medical examination by an examining physician, Dr. Downhour, who issued a report on the form provided by the board and set forth his opinion as to the nature of relator's disability and indicated that the disability is ongoing. Dr. Downhour listed the following medical conditions which, in his opinion, rendered relator physically incapacitated for a period of at least 12 months: "Connective Tissue Disorder," "Chronic Pain Disorder," and "Small Fiber Peripheral Neuropathy."
 {¶ 42} Pursuant to R.C. 3309.39(C), SERS had relator examined by Dr. Vaughan. As noted in the findings of fact, Dr. Vaughan was provided with a form requesting that she examine relator for "the condition for which disability is claimed" as well as a "general summary of the applicant's physical and mental condition as a guide in determining disability." SERS listed the three conditions which Dr. Downhour opined were the cause of relator's disability. In her report, Dr. Vaughan agreed that relator's connective tissue disorder was rendering him physically incapable of performing his duties as a custodian.
 {¶ 43} Because Dr. Vaughan, the examiner for SERS, certified that relator was disabled, Dr. Season, the chairman of MAC, recommended that the SERS board grant disability retirement benefits to relator for the condition of connective tissue disorder.
 {¶ 44} Approximately one year later, relator was notified that his disability retirement was currently under review. Pursuant to R.C.3309.41(B), the SERS board shall require a disability benefit recipient to undergo an annual medical examination unless the board's physician certifies that the recipient's disability is ongoing. Pursuant to R.C.3309.41(C), the SERS board selected physicians to examine relator. Dr. Thomas was provided a form specifically requesting that he give an opinion with regard to whether or not relator was disabled due to connective tissue disorder as well as give a general summary of relator's physical and mental condition. Dr. Thomas indicated in his March 11, 2003 report that relator does have fibromyalgia but found no evidence of an inflammatory muscle disease. As such, he concluded that he found "no rheumatological basis for disability."
 {¶ 45} Dr. Clary was asked to examine relator with regard to the condition of anxiety. Dr. Clary opined that relator's panic attacks were not work-prohibitive and do not cause a long-term disability. Dr. Irwin was asked to examine relator with regard to the conditions of "spasmodic angina, reflux, spastic colon." In his report, Dr. Irwin noted that relator does suffer from chronic fibromyalgia which Dr. Irwin indicated it was his opinion that relator "received disability initially 1 ½ years ago." Dr. Irwin noted that relator's spasmodic angina, reflux esophagitis, and spastic colon, do not render him disabled and are not of sufficient and tendency to prevent his employment at his current job description.
 {¶ 46} Based upon a review of the reports of Drs. Thomas, Clary, and Irwin, the reviewing doctors of MAC, Drs. Fallon, Wooley, and Gallagher, recommended to Dr. Season, the chairman of MAC, that relator's disability retirement be terminated and the board agreed. Relator appealed and submitted the December 5, 2003 report of Dr. Renneker. Dr. Renneker noted that relator has constant bilateral low back pain with daily radiation of pain and paresthesia down his right thigh to his knee, that he has more than two hours of total body stiffness on waking, is easily fatigued, lacks refreshing sleep, that his total body achiness is aggravated by cold, damp weather, when exposed to loud noises, and when he overexerts. Relator also complained of constant pain in his shoulders with stiffness, weakness in his arms and hips, and decreased left grip strength. Dr. Renneker opined that relator does suffer from fibromyalgia, connective tissue disease with intermittent weakness, small fiber neuropathy, chronic pain disorder, chronic right L4 and L5 radiculopathy, bilateral shoulder adhesive capsulitis and tendonitis, mild left hand Dupuytren contractures and bilateral hip flexion contractures. She concluded that relator was unable to perform his tasks as a school custodian and stated that he is unable to sweep, scrub, wax, and maintain all school floors, that he is unable to climb ladders to change lightbulbs or wash windows or walls, and that he is unable to unload supplies that weight more than 15 to 20 pounds.
 {¶ 47} Dr. Downhour also submitted a letter to SERS indicating that he believes relator's current disabling condition is fibromyalgia and referenced the fact that relator had been referred to Dr. Kistle at the Ohio State University and Dr. Hobayan, a local board certified rheumatologist. Both doctors opined that relator had severe musculoskeletal pain and fibromyalgia syndrome.
 {¶ 48} Based upon a review of the evidence, and specifically Dr. Downhour's additional report, Dr. Fallon, one of the reviewing physicians on MAC, recommended that a second independent evaluation should be obtained specifically to examine relator's fibromyalgia and radicular symtomatology. Drs. Wooley and Gallagher, also reviewing physicians for MAC, reviewed the medical evidence and concluded that they agreed with Drs. Thomas, Clary, and Irwin. Following a meeting of MAC, Dr. Fallon changed his opinion and concluded that, because Dr. Renneker stipulated a 70 pound weight restriction, relator would be able to perform his former job because his job description did not indicate lifting greater than 70 pounds. As such, Dr. Fallon concluded that the only issue raised by Dr. Renneker's report, a 70-pound lifting restriction, was not an issue.
 {¶ 49} It is not the job of this court to reweigh the medical evidence before the SERS board. However, as with matters before the commission, in the event that this court finds that mistakes have been made, the matter can be remanded to SERS for a new determination. In the present case, the magistrate notes the following problems with SERS's determination. First, the reviewing physicians for MAC misinterpreted Dr. Renneker's report. Dr. Renneker specifically noted that relator was restricted from lifting anything weighing more than 15 to 20 pounds. In concluding that Dr. Renneker put a 70-pound lifting restriction on relator and in basing their decision, in large part, upon this conclusion, the SERS reviewing physicians abused their discretion and misinterpreted the medical evidence before them. Relator's job description form indicates he must be able to lift up to 70 pounds. For that reason alone, this magistrate recommends that a writ of mandamus be issued ordering the reviewing physicians of MAC to review the medical evidence, after correctly interpreting Dr. Renneker's report, and redetermine the issue of relator's entitlement to disability. Although SERS is not required to provide the type of explanation required of the commission pursuant to State ex rel. Noll v.Indus. Comm. (1991), 57 Ohio St.3d 203, when, as here, SERS provides an explanation this court can review and determine whether or not the decision was proper.
 {¶ 50} Second, relator correctly asserts that SERS failed to provide the examining physicians with a copy of his job description. As such, it appears that only Drs. Downhour and Renneker actually had the formal job description from the Lima City School District regarding the physical demands of relator's work. One could argue that all custodial jobs are similar enough that lifting requirements would apply across the board. However, the magistrate finds that such a determination ignores the differences in work settings among different jobs. Furthermore, pursuant to R.C. 3309.39, the question is whether or not the person is incapacitated from the performance of their last assigned primary job duty as an employee by a disabling condition which is either permanent or presumed to be permanent for 12 continuous months following the filing of an application. In order to make such an assessment, the magistrate finds that the physicians must be aware of the employee's last assigned primary duties as an employee. A general description of custodian does not suffice. For this additional reason, the examining physicians should be asked to reissue their reports in light of actual knowledge of relator's job duties.
 {¶ 51} Based on the foregoing, this magistrate finds that relator is entitled to a writ of mandamus ordering SERS to obtain new opinions from the physicians who examined relator with regard to the conditions which disabled him, specifically, connective tissue disorder and fibromyalgia, and to reissue their opinions after being provided with a complete job description for relator's previous employment. Further, the reviewing physicians of MAC must reevaluate the medical evidence, upon a proper reading of the restrictions listed in Dr. Renneker's report, and redetermine whether or not relator is or is not entitled to remain on disability. Thereafter, the SERS board must render its decision.