[Cite as *State ex rel. Cornely v. Ohio Pub. Emps. Retirement Sys.*, 2013-Ohio-4205.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio ex rel.               :
Tracey Cornely,
                                       :

           Relator,                                  :
                                       :                 No.  12AP-676
v.
                                       :            (REGULAR CALENDAR)

Ohio Public Employee[s]
Retirement System,                     :

           Respondent.                       :

---

D E C I S I O N

Rendered on September 26, 2013

---

*Agee, Clymer, Mitchell, & Laret,* and *Gregory R. Mitchell,*
for relator.

*Michael DeWine*, Attorney General, and *Matthew T. Green*,
for respondent.

---

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

CONNOR, J.

{¶ 1}   Relator, Tracey Cornely, brings this original action seeking a writ of mandamus ordering respondent, the Ohio Public Employees Retirement System ("PERS"), to vacate its order terminating relator's disability benefits and to order PERS to find relator entitled to disability benefits.

{¶ 2}   Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate, who has now rendered a decision and recommendation that includes findings of fact and conclusions of law, which is appended

to this decision. The magistrate concluded that PERS abused its discretion and recommended that this court issue the requested writ of mandamus. PERS has filed objections to the magistrate's decision and the matter is now before us for our independent review.

{¶ 3} As reflected in the facts given in the magistrate's decision, relator was employed by the state of Ohio as a unit management administrator for the Ohio Department of Youth Services. Relator applied for disability benefits on July 9, 2008, supporting her application with the report of her treating physician, Lee A. Herbert, M.D.

{¶ 4} Dr. Herbert diagnosed relator as suffering from systemic lupus erythematosus ("SLE" or "lupus") with kidney involvement, and "principally severe SLE related headache." (Certified Record, 12.) Dr. Herbert's report indicated that relator suffered from daily disabling headaches with loss of cognitive abilities "due to having an administrative position in a 24/7 juvenile correctional institution where she has no control over length of workday." (Certified Record, 11.) Dr. Herbert further noted that relator had "little time away from work to recover from stress," that she was "[u]nable to sleep at night due to headaches as well as receiving calls from work," and experienced "[e]xtreme fatigue when Lupus flares." (Certified Record, 11.) Dr. Herbert noted that "[s]tress is well known to be a trigger for SLE flare" and found that relator's unit management administrator position was "so stressful that she [was] placed in jeopardy because of the effects of stress to make her lupus worse." (Certified Record, 12.)

{¶ 5} PERS requested that relator be examined by PERS' independent medical examiner, Terry L. Irwin, M.D. Dr. Irwin found that relator's lupus related headaches were "quite frequent and severe," and noted that the stress from her unit management administrator position "tended to precipitate more frequent episodes and also when she ha[d] a headache it ma[de] her handling the duties effectively essentially impossible." (Certified Record, 31.) Dr. Irwin found relator permanently disabled.

{¶ 6} PERS approved relator for disability benefits. Relator subsequently acquired a part-time position at Marion Technical College as a program coordinator. The program coordinator position did not affect relator's entitlement to disability benefits.

{¶ 7} PERS' independent medical examiner, Christopher D. Cannell, M.D., examined relator on January 4, 2011 identifying her job "as a program coordinator for

Marion Technical College."  (Certified Record, 70.)  Dr. Cannell opined that relator could perform the job requirements of working 24 hours per week as a program coordinator, and thus was not disabled.  Dr. Cannell noted that "[o]f course, her role to function in that capacity could potentially change if she would have a future exacerbation of her systemic lupus erythematosus."  (Certified Record, 72.)

{¶ 8}  On February 16, 2011, PERS reviewed relator's disability benefit file, found she was no longer permanently disabled from performing her duties as a unit management administrator, and terminated her disability benefits.

{¶ 9}  On February 25, 2011, Dr. Cannell provided an addendum to his January 4, 2011 report, acknowledging that he had considered the incorrect job in his original report. Dr. Cannell indicated that he had received the official job description for the unit management administrator position, noting that the position involved training, providing support to all unit programming, security and custody activities, coordinating overall unit management processing, supervising all unit managers, attending meetings, formulating correspondences, and interviewing job applicants.  (Certified Record, 78.)  Dr. Cannell further indicated that he spoke with relator over the telephone, and gathered the following information about the unit management administrator position:

> [T]here would be days where she would have to work longer hours than usual and days when she would be called at various hours to address at times even life-threatening issues. She states that because of the inability to manage her schedule, as well as the decision making that would be required, she was unable to perform that job any longer because of the medical conditions that included systemic lupus erythematosus as well as chronic headaches.

(Certified Record, 78.)

Dr. Cannell determined that "from a physical standpoint, [realtor would] be able to perform the job requirements as given * * * and that the disability is not presumed to be permanent." (Certified Record, 78.)

{¶ 10} Relator appealed the termination of her disability benefits, providing additional medical evidence in support of the appeal.  The additional medical evidence demonstrated that relator's lupus rendered her unable to perform the duties of the unit

management administrator position. PERS medical advisors, A. Smith and M. Mast, reviewed the medical evidence and concluded there was insufficient objective evidence of permanent disability due to SLE. PERS upheld its termination of relator's disability benefits. (Certified Record, 169.)

{¶ 11} The magistrate concluded that PERS abused its discretion by failing to provide Dr. Cannell with a description of relator's job duties which accurately reflected relator's day-to-day obligations. As such, the magistrate determined that Dr. Cannell's addendum did not constitute some evidence on which PERS could rely to terminate relator's disability benefits.

{¶ 12} PERS has timely filed the following objections to the magistrate's conclusions of law:

> [I.] The Magistrate's Decision errs in concluding that there is "no evidence from which it could be concluded that Dr. Cannell actually was aware of relator's actual job duties" and that Dr. Cannell's report cannot constitute "some evidence" in support of OPERS' decision.
>
> [I.] The Magistrate's Decision errs in concluding the opinions of OPERS' medical advisors do not constitute "some evidence" in support of OPERS' decision.
>
> [III.] The Magistrate's Decision errs in failing to recognize how this case is dissimilar to *State ex rel. Leedy v. School Employees Ret. Syst.*, 10th Dist. No. 04AP-473, 2005-Ohio-1764.
>
> [IV.] The Magistrate's Decision errs to the extent it suggests OPERS has an affirmative obligation to create a new or revised job description for Cornely.
>
> [V.] While the Magistrate's Decision cites the correct standard of review, it does not actually use that standard.

{¶ 13} "Mandamus is the appropriate remedy where no statutory right of appeal is available to correct an abuse of discretion by an administrative body." *State ex rel. Hudson v. Ohio Pub. Emps. Retirement Sys.,* 10th Dist. No. 10AP-904, 2011-Ohio-5362, ¶ 64. "The determination of whether a retirement-system member is entitled to the continued receipt of disability-retirement benefits is within the exclusive authority of the

retirement board, R.C. 145.362, and the board's denial of an appeal from the termination of these benefits is final and not subject to appeal." *State ex rel. Cydrus v. Ohio Pub. Emps. Retirement Sys.*, 127 Ohio St.3d 257, 2010-Ohio-5770, ¶ 12. "Because there is no statutory appeal from the board's determination that relator is not entitled to continued disability benefits, mandamus is an appropriate remedy." *Hudson* at ¶ 64.

{¶ 14} A relator seeking a writ of mandamus must establish "[1] a clear legal right to the relief requested, [2] that PERS has a clear legal duty to provide the requested relief, and [3] that relator has no plain and adequate remedy in the ordinary course of the law." *Id.* at ¶ 65. "To be entitled to the requested writ of mandamus, relator must establish that the board abused its discretion by denying her request for disability benefits." *Id.,* citing *State ex rel. Mallory v. Pub. Emps. Retirement Bd.,* 82 Ohio St.3d 235 (1998). If there is "some evidence to support the board's decision, an abuse of discretion has not been shown." *Id.* PERS has no duty "under statute or administrative rule to specify the evidence it relied upon or to explain its reasons for terminating * * * disability * * * benefits." *Cydrus* at ¶ 17.

{¶ 15} Ohio Adm.Code 145-2-21(A)(1)(a) defines "disability" as "a presumed permanent mental or physical incapacity for the performance of a member's present or most recent public duty that is the result of a disabling condition that has occurred or has increased since an individual became a member." R.C. 145.362 generally requires a person receiving disability benefits to undergo an annual medical examination. *Cydrus v. Pub. Emps. Retirement Sys.*, 10th Dist. No. 09AP-595, 2010-Ohio-1143, ¶ 5. Medical examinations must be "conducted by a competent disinterested physician or physicians selected by the board to determine whether the member is mentally or physically incapacitated for the performance of duty by a disabling condition either permanent or presumed to be permanent." R.C. 145.35(E).

{¶ 16} PERS' first objection asserts the magistrate erred in finding that Dr. Cannell was unaware of relator's actual job duties, and in finding that Dr. Cannell's addendum could not constitute some evidence.

{¶ 17} We cannot agree with the magistrate's conclusion of law finding that PERS failed to provide Dr. Cannell with an adequate description of the unit management administrator position. Before drafting his addendum, Dr. Cannell reviewed the official

job description and spoke to relator over the phone regarding the unit management administrator position. Relator informed Dr. Cannell that, due to her lupus and chronic headaches, she was unable to perform the duties required by the unit management administrator position. Although Dr. Cannell did not state in his addendum that relator was on call 24/7, or that she would receive calls in the middle of the night, he did acknowledge that she would work longer hours than usual, could be called at various hours to address life-threatening issues, and was unable to manage her schedule. Accordingly, we find that Dr. Cannell possessed adequate information regarding relator's actual job duties. *Compare Hamby v. Ohio Pub. Emps. Retirement Sys.*, 10th Dist. No. 08AP-298, 2008-Ohio-5068, ¶ 29.

{¶ 18} Nonetheless, we conclude that the magistrate correctly found that Dr. Cannell's addendum was not some evidence on which PERS could rely, but for different reasons than those cited by the magistrate. In his addendum, Dr. Cannell acknowledged the stressful aspects of relator's job and relator's report that she could not physically perform the duties of a unit management administrator because of her SLE and chronic headaches. Dr. Cannell then concluded, without explanation, that relator could perform those job duties. Dr. Cannell failed to explain in his addendum why relator's lupus did not prevent her from performing the duties required by the unit management administrator position. Dr. Cannell's addendum did not address the affect that stress may have on lupus.

{¶ 19} As the addendum acknowledged that relator reported that her lupus and chronic headaches prevented her from performing the duties required by the unit management administrator position, but concluded, without explanation, that relator could perform the duties required by that position, the addendum is internally inconsistent and could not constitute some evidence on which PERS could rely. *Compare State ex rel. Lopez v. Indus. Comm.*, 69 Ohio St.3d 445, 449 (1994) (concluding that a medical report which found " 'normal' physical findings" yet which assessed "a high (fifty percent) degree of impairment" and concluded that the claimant could "perform heavy foundry labor," was internally inconsistent and could not constitute some evidence to support a decision of the Industrial Commission of Ohio).

{¶ 20} Based on the foregoing, we conclude that PERS provided Dr. Cannell with an accurate description of relator's job duties. However, we find that Dr. Cannell's addendum cannot constitute some evidence on which PERS could rely, as it is internally inconsistent. Accordingly, PERS' first objection is sustained in part and overruled in part.

{¶ 21} PERS' second objection asserts that the magistrate erred in concluding that the recommendations of PERS' medical advisors, also known as medical consultants, could not constitute some evidence to support PERS' order terminating relator's disability benefits. The magistrate found that, since "PERS must rely on medical evidence which constitutes 'some evidence,' " and since Dr. Cannell's addendum could not be considered " 'some evidence' with which the medical advisors could agree," the reports of the medical advisors could not alone constitute some evidence. (Magistrate's decision, 17.)

{¶ 22} Ohio Adm.Code 145-2-23(C)(1) provides that "[a]fter submission of any additional medical evidence as described in paragraph (B)(3)(d) of this rule, all evidence shall be reviewed by the board's medical consultant(s) who shall recommend action for concurrence by the board." If the board "concurs with a recommendation for approval of the appeal, disability benefits shall be paid." Ohio Adm.Code 145-2-23(C)(2). "If the board concurs with a recommendation for denial of the appeal, the member shall be notified by regular mail of the board's decision."

{¶ 23} Thus, PERS medical consultants review the evidence in the record and make a recommendation based on such evidence. As such, the medical consultant's recommendation cannot constitute some evidence unless the medical evidence they relied upon to support their recommendation equally constitutes some evidence. Here, medical advisors A. Smith and M. Mast found insufficient evidence of permanent disability due to SLE. The only medical evidence in the record finding that relator's lupus did not prevent her from performing the duties of her unit management administrator position was Dr. Cannell's addendum. Because Dr. Cannell's addendum was internally inconsistent, and thus did not constitute some evidence, the medical consultants' reports relying on the addendum also could not constitute some evidence.

{¶ 24} Relying on *State ex rel. Bell v. Ohio Police & Fire Pension Fund*, 10th Dist. No. 11AP-628, 2012-Ohio-6153 and *State ex rel. Guthrie v. Ohio Pub. Emps. Retirement Sys.*, 10th Dist. No. 10AP-689, 2011-Ohio-6557, PERS asserts that this court has already

concluded that opinions from PERS medical advisors can alone constitute some evidence on which PERS may rely.

{¶ 25} In *Bell*, the agency assessing disability was the Ohio Police and Fire Pension Fund and its board of trustees ("OP&F"), not PERS. The disability recipient in *Bell* asserted that OP&F abused its discretion by rejecting the revised recommendation of its medical advisor. Unlike the medical advisors in the instant case, the OP&F medical advisor based his revised recommendation "on testimony presented at the April 26, 2011 appeal hearing," where the disability recipient testified before the board. *Id.* at ¶ 8. In *Bell,* this court concluded that, as contrary medical evidence existed in the record, "the board was not required to accept the revised recommendation of [the board's medical advisor]." *Id.* at ¶ 11. While this court also found earlier reports from the board's medical advisor to be "some evidence[;]" in those earlier reports the medical advisor stated that he relied " on the reports of Drs. Clary, Sanford, and Soliman." *Id.* at ¶ 78. Because at least one of those doctors' reports supported the advisors recommendation, the recommendation itself thus relied on some evidence.

{¶ 26} In *Guthrie*, the relator argued that the magistrate erred in relying on Dr. Carl F. Asseff's report. This court noted that the magistrate had relied on "both [Dr.] Asseff and [medical advisor] Mast's opinions as some evidence supporting the board's decision to terminate relator's disability benefits." *Id.* at ¶ 11. We further noted that "Dr. Asseff's July 23, 2009 report constitute[d] some evidence supporting the board's decision to terminate relator's disability benefits." *Id.* Thus, in *Guthrie,* the medical advisor's opinion constituted some evidence as the doctor's report which the medical advisor relied on equally constituted some evidence.

{¶ 27} Based on the foregoing, PERS' second objection is overruled.

{¶ 28} PERS' third objection asserts that the magistrate erred in failing to realize how the instant case differs from *State ex rel. Leedy v. School Emps. Retirement Sys.*, 10th Dist. No. 04AP-473, 2005-Ohio-1764. In *Leedy*, the School Employees Retirement System failed to provide Leedy's examining physician with a copy of Leedy's job description. This court held that, in order to determine whether Leedy was incapacitated from performing his job duties, the "physicians must be aware of the employee's last assigned primary duties as an employee." *Id.* at ¶ 50. The magistrate cited *Leedy* in the

instant case for the proposition that a physician examining a worker for disability benefits must have an understanding of the worker's job duties in order to properly assess whether the worker is disabled.

{¶ 29} As we determined under our ruling on PERS' first objection that Dr. Cannell did receive an adequate description of relator's job duties, the magistrate's citation to *Leedy* is now immaterial. As such, PERS' third objection is rendered moot.

{¶ 30} PERS' fourth objection asserts the magistrate erred by suggesting that PERS was under an obligation to create a new official job description for the unit management administrator position. The magistrate's decision does not indicate that PERS was obligated to create a new official job description. PERS' fourth objection is overruled.

{¶ 31} PERS' fifth objection asserts that the magistrate failed to apply the correct standard of review for granting a writ of mandamus. PERS asserts that the magistrate improperly weighed the evidence to determine that Dr. Cannell did not receive an adequate description of relator's job duties. *See State ex rel. Thomas v. Pub. Emps. Retirement Sys.*, 10th Dist. No. 03AP-137, 2004-Ohio-1403, ¶ 47 (noting that "[i]n mandamus, however, the court does not weigh the evidence"). Our ruling on PERS' first objection renders PERS' fifth objection moot.

{¶ 32} Following independent review, pursuant to Civ.R. 53, we find the magistrate has properly determined the pertinent facts, and we adopt them as our own. For the reasons set forth in this decision, however, we reject the magistrate's conclusion of law finding that PERS abused its discretion by failing to provide Dr. Cannell with an adequate description of the unit management administrator job duties. Instead, we conclude that Dr. Cannell's addendum was internally inconsistent. As such, PERS abused its discretion by denying relator's appeal and upholding its order terminating relator's disability benefits without some evidence to support its decision. We adopt the remainder of the magistrate's conclusions of law which are not addressed in this decision.

{¶ 33} PERS is ordered to vacate its order terminating relator's disability benefits, and to issue a new order which is supported by some evidence in the record. PERS may either permit Dr. Cannell to issue a new opinion which complies with this decision, or may have relator examined by a different independent medical examiner. Based on the foregoing, we sustain in part and overrule in part PERS' first objection to the magistrate's

decision, rendering PERS' third and fifth objections moot, and overrule the second and fourth objections.  Therefore relator's request for a writ of mandamus is granted.

*Objections sustained in part*
*and overruled in part;*
*writ granted.*

BROWN and SADLER, JJ., concur.

———————————————

# A P P E N D I X

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio ex rel. | : | |
| Tracey Cornely, | | |
| | : | |
| Relator, | | |
| | : | No.  12AP-676 |
| v. | | |
| | : | (REGULAR CALENDAR) |
| Ohio Public Employee[s] | | |
| Retirement System, | : | |
| | | |
| Respondent. | : | |

---

M A G I S T R A T E ' S   D E C I S I O N

Rendered on January 17, 2013

---

*Agee, Clymer, Mitchell, & Laret,* **and** *Gregory R. Mitchell*, for relator.

*Michael DeWine*, **Attorney General, and** *Matthew T. Green*, for respondent.

---

IN MANDAMUS

{¶ 34} Relator, Tracy Cornely, has filed this original action requesting that this court issue a writ of mandamus ordering respondent, Ohio Public Employees Retirement System ("PERS"), to vacate its decision which terminated relator's disability and ordering PERS to find that she is entitled to those benefits.

Findings of Fact:

{¶ 35} 1. Relator was employed as the unit management administrator for the Ohio Department of Youth Services.

{¶ 36} 2. Pursuant to her employment with the state of Ohio, relator was a member of PERS.

{¶ 37} 3. Relator originally applied for disability benefits in July 2008.

{¶ 38} 4. In support of her application, relator submitted form DR-3, Report of Attending Physician for Disability Applicant ("Report of Attending Physician"), as well as several reports from her treating physician Lee A. Hebert, M.D. In completing the Report of Attending Physician, Dr. Hebert described the symptoms which relator was experiencing:

> Daily disabling headache [with] loss of cognitive abilities due to having an administrative position in a 24/7 juvenile correctional institution where she has no control over length of workday (often works beyond 8 [hours] per day/40 weekly). Little time away from work to recover from stress (phone, pagers). Unable to sleep at night due to headaches as well as receiving calls from work. Extreme fatigue when Lupus flares.

> 5. In his August 12, 2008 report, Dr. Hebert stated:

> **Diagnosis:** SLE with kidney involvement and major non-renal manifestations, principally severe SLE related headache. Severe narcotic resistant headaches in SLE are fairly common they are thought to be due to the same processes that cause migraine headaches but very often do not respond well to migraine type therapy. They also do not respond well to narcotics and for this reason are quite disabling.

> At the present time the kidney manifestations of Mrs. Cornely are in remission while she receives immunosuppressive and steroid therapy.

> **General Comments:**
> Stress is well known to be a trigger for SLE flare. The concern is that her current employment is so stressful that she is placed in jeopardy because of the effects of stress to make her lupus worse. Indeed, she [has] already had several relapses including relapses involving her kidneys.

{¶ 39} 6. The additional reports initially submitted specifically note that relator's health had improved since she had been away from her stressful job.

{¶ 40} 7. PERS had relator examined by Terry L. Irwin, M.D. In his September 9, 2008 report, Dr. Irwin noted the following diagnosis:

> [One] Systemic lupus erythematosus.
> [Two] Lupus Nephritis with proteinuria.
> [Three] Lupus related headaches, narcotic resistant.

{¶ 41} 8. In opining that relator was unable to continue to work at her job and was considered totally and permanently disabled, Dr. Irwin specifically noted:

> She has a chronic history of systemic lupus erythematosus manifested primarily by arthralgias, proteinuria and with recurring narcotic resistant headaches. Although she has taken Triptan drugs for migraine headaches as well they generally do not control the lupus related headaches, which are quite frequent and severe. I've reviewed her job description, which requires her to be on-call 24 hours per day, seven days a week as a unit management administrator for a juvenile corrections facility. She is frequently called when she is away from her scheduled hours at the facility and at times has had to return to the facility. This stress has tended to precipitate more frequent episodes and also when she has a headache it makes her handling the duties effectively essentially impossible. Her physicians that follow her for the lupus feel the job situation is detrimental to her health and can contribute to progression of the lupus as well.

{¶ 42} 9. In a letter dated September 19, 2008, relator was notified that the PERS medical advisor had recommended approving her disability benefit application.

{¶ 43} 10. Relator became employed at Marion Technical College in a position which did not jeopardize her receipt of continuing disability benefits.

{¶ 44} 11. In a letter dated September 24, 2009, relator was notified that the PERS medical advisor was requesting that she be examined by an independent medical examiner.

{¶ 45} 12. Relator was examined by Robert C. Woskobnick, D.O. In his November 19, 2009 report, Dr. Woskobnick noted the following history:

Ms. Cornely relates a history of having systemic lupus erythematosus diagnosed 8-1/2 years ago. She sees a rheumatologist in Columbus, Dr. Catherine Lee. She has chronic headaches of the migraine variety related to her lupus diagnosis and has gastroesophageal reflux disease. She currently is working about 25 hours a week running a college program in the Marion Technical College associated with the Marion Prison System. She has a history of lupus nephritis. She has chronic fatigue related to her illness. When she last worked full time hours was at a juvenile correction facility in Marion where she is on call 24/7 and received phone calls in the middle of the night and lots of additional hours. This would cause stress, fatigue, promote headaches that caused cognitive problems and caused exacerbation of her underlying lupus.

Dr. Woskobnick noted the following diagnosis:

[One] History of chronic lupus erythematosus under the care of rheumatologist, Dr. Catherine Lee.
[Two] Chronic migraine headaches exacerbated by stress.
[Three] Gastroesophageal reflux disease.
[Four] Lupus nephritis.

{¶ 46} Dr. Woskobnick ultimately concluded that relator was permanently and totally disabled, stating:

My medical assessment of the claimant's ability to do work-related activities includes the following: Ms. Cornely has a history of chronic systemic lupus erythematosus that is exacerbated by stress as are her migraine headaches. She would have difficulty keeping a regular straight schedule and would have to have flexibility built into her schedule due to exacerbation of her chronic disease states, systemic lupus erythematosus and chronic migraine headaches. It would be beneficial to have input from her treating rheumatologist, Dr. Catherine Lee.

{¶ 47} 13.  In a letter dated December 11, 2009, relator was advised that the PERS medical advisor had recommended that her disability benefits continue.

{¶ 48} 14.  By letter dated November 24, 2010, relator was notified that she would be scheduled for an independent medical re-examination.

{¶ 49} 15.  An independent medical examination was conducted by Christopher D. Cannell, M.D.   At the outset of his January 4, 2011 report, Dr. Cannell identifies relator's job as follows:

> She works as a program coordinator for Marion Technical College apparently associated with the Marion Prison system. She states she currently works 24 hours per week as a coordinator although there are quarters or semesters when she is teaching at times up to four to six hours per week as well although currently she is not teaching.
>
> 16.  Dr. Cannell noted the following impression:
>
> [One] Systemic lupus erythematosus diagnosed 10 years ago. She is reportedly stable and being managed pharmacologically under the care of Dr. Catherine Lee, rheumatologist.
> [Two] Previous history of lupus nephritis, last recurrence in 2003, with reportedly normal renal function.
> [Three] Chronic intermittent right trochanteric bursitis/-enthesitis.
> [Four] Chronic headaches that are at least in part vascular or migraine.
> [Five] Gastroesophageal reflux.

{¶ 50} 17.  Ultimately, Dr. Cannell opined that relator was not permanently and totally disabled, stating:

> After review of the medical records provided as well as the physical examination of Ms. Tracey Cornely, it is my opinion that the job requirements can be satisfied and the disability is not presumed to be permanent. At this time, she is able to perform her job duties working 24 hours per week as a program coordinator for the Marion Technical College. Of course, her role to function in that capacity could potentially change if she would have a future exacerbation of her systemic lupus erythematosus. Based on my current assessment today, in my opinion she is able to perform the job requirements and they can be satisfied and disability at this point is not presumed to be permanent.

{¶ 51} 18. Medical advisors J. Moore and A. Smith, reviewed relator's file and concluded that relator was no longer considered to be permanently disabled from the

performance of her duties as a unit management administrator and that her disability benefits were being terminated.

{¶ 52} 19. Dr. Cannell prepared an addendum report dated February 25, 2011. The reason for the addendum was his failure to address her specific job description as the unit management administrator with the Ohio Department of Youth Services. After noting that he had read the job description, Dr. Cannell noted that he had spoken with relator and that she had provided him with the following additional information:

> She states that there would be days where she would have to work longer hours than usual and days when she would be called at various hours to address at times even life-threatening issues. She states that because of the inability to manage her schedule, as well as the decision making that would be required, she was unable to perform that job any longer because of the medical conditions that included systemic lupus erythematosus as well as chronic headaches.

{¶ 53} Thereafter, Dr. Cannell again concluded that she would be able to perform the job requirements as given to her.

{¶ 54} 20. In support of her appeal, relator submitted additional medical evidence as required by Ohio Adm.Code 145-2-23(B)(3)(d), including the following, which are particularly relevant:

{¶ 55} (a) The May 19, 2010 report of Albert L. Berarducci, Jr., M.D., a neurologist who had been treating relator. With regard to her headaches, Dr. Berarducci noted the following:

> Ms. Cornely states that her headaches were reaching the point of being "intolerable" for "a couple of years," (which would have encompassed the time of her last visit to see me). She was working full-time in a prison and found that the stress of that job was too much and included 24-hour on-call responsibilities, 10-12 hour work shifts, and the inevitable demanding environment of a prison's working. She ultimately quit that job about one year ago (? Timing chronology) and now works a part-time job, in which she works only 5 or 6 hours. It is [sic] still entails work inside the prison, but "I schedule myself" and is working with inmates who want to be introduced to a "college program." With the part-time job, she has noticed about a 50% improvement in headache frequency, but she has become concerned because

the headache is still present at about 3-4 per week (12-15 headache days monthly). Because she is "not sure why" the headache is still present at this rate, especially over the past two months, she has come in for headache re-evaluation. This headache frequency is the best since 2008.

{¶ 56} (b)  The December 27, 2010 report of Dr. Hebert, he also discussed the frequency of her current headaches:

Headache continues to be a problem with 3-4 episodes per week. Imitrex is very helpful. She takes about 5 or 6 doses per month.

At the present time she has no signs or symptoms to suggest activation of her SLE. She is taking her medicines faithfully.

{¶ 57} (c) The March 3, 2011 progress note of Vivek R. Awasty, M.D., who noted the following:

The patient since 2008 has been doing a lot better since her stress has been relieved. The patient has had no flare-up of lupus since the stress has come down. She has seen the rheumatologist, the neurologist, as well as the nephrologist at this time.

* * *

ASSESSMENT:
[One] Severe headaches.
[Two] Lupus nephritis of the kidneys.

PLAN:
[One] I discussed with the patient. The patient with history of lupus and has had severe headaches which has required Topamax and has had lupus nephritis of the kidneys for which she has seen the nephrologist and is seeing the rheumatologist for the lupus itself. I advised the patient she must continue seeing all 3 specialists. In my opinion, she is doing better with the less stressful job and we will write a letter or indicate to that fact in the form presented to us about her disability.

{¶ 58} (d) The April 12, 2011 report of Raymond D. Richetta, Ph.D., who discussed her condition from a psychological point of view.  Dr. Richetta discussed the history of her condition as follows:

She described her physical status by saying she is doing "well. I still have headaches but don't have the level of intensity I had. The fatigue level is now much more manageable because the job I have now lets me leave for the day if I get too tired."

She described her emotional status by saying, "As well I have ever done [since being diagnosed with lupus]. I don't have the stress most people have. I have a great marriage. I exercise every day. As long as I don't have the headaches, I do pretty well . . . and that's because I don't have a job that burdens me down, that used to be the case."

She had worked as a Unit Manager Administrator at a juvenile detention center, the Marion Juvenile Correctional Facility. She left that job in May 2008 due to the physical consequences of the lupus and subsequent disability. She went on short-term disability from May to October 2008. She then went on long-term disability. The job description for that position indicates the employee to be "on call 24 hours a day, 7 days a week . . . receive calls, pages at home— sometimes in the middle of the night . . . work 50+ hours a week . . . fill in for unit manager in his/her absence, work shift if necessary . . .makes critical decisions" plus many other daily demands. She said that she has had management jobs her whole life but she never experienced the demands of that former position. She was on call 24/7, could get pages at anytime. She said the work day was totally unpredictable. She "never got a break from work, even when I was home." Most days she did not get a chance to eat lunch. She was "running" almost constantly at work. She said one of the most difficult things about that job was being unable to "ever get away from it." She worked at the facility for eight years, starting out working in recreation, developing recreational programs. She then went to work in the education area, doing guidance counseling-like work. She then went to work in administration, processing intakes and supervising that department. She was also a warden's assistant for a year and a half. She then took the Unit Manager Administrator when that position was created in late 2007. She worked that job until May 2008, about six months after that position was created. She said none of the previous jobs exacerbated her lupus but the last job did. She said she could not enjoy her time at work and could not enjoy her home life either due to being "consumed at what was going on with work. And I constantly had a headache. The work day was so busy I

> couldn't take a break to let the headache go away." She said her lupus flare-ups have twice challenged her kidneys. She said she does well physically if not under emotional stress.
>
> She now works as a college program coordinator, running an off-site college program for Marion Technical College. The area of study at her location is business management. She meets with students, advises students, enrolls students, schedules teachers and processes the grades (similar to what would be done at a registrar's office at a main college site). Her contract is for 24 hours a week, which is about what she works typically. She said she is able to manage that position because she has no specific time demands as to what hours she needs to be in at the work site. She said PERS approved her to work the current job, which she has worked for two years.

{¶ 59} Dr. Richetta concluded that relator suffered from: "Psychological Factors [Stress-Related Physiological Response] Affecting Medical Condition" and concluded that condition precluded her from returning to work as a unit management administrator despite the fact that she is "generally an emotionally robust person who will not be subjected to significant emotional stress working most well defined jobs which have set parameters and little likelihood of long hours or unpredictable events.         (e)   The May 7, 2011 report of Otto Kausch, M.D., a psychiatrist.   He noted that relator's lupus symptoms would increase if she was under too much stress.   He agreed with Dr. Richetta's assessment that she suffered from psychological factors affecting physical conditions and opined that, while she could work her part-time job, she was disabled from returning to her former job as a unit management administrator because the stress from that job would activate her lupus.

{¶ 60} (f) The May 12, 2011 report of Nancy Renneker, M.D., who described her position as a unit management administrator as follows:

> Tracey Cornely reports that she worked at Marion Juvenile Correctional Institute for approx. 6 years as a corrections officer prior to her being promoted to a Unit Management Administrator at Marion Juvenile Correctional Institute. Tracey Cornely reports that since this promotion she now works 50 plus hours a week and Tracey Cornely reports that in one way she has no control of her schedule with Tracey Cornely reporting that she is on a beeper "24/7" and Tracey

Cornely reports that she is frequently called at home over prison matters with Tracey Cornely reporting that at times she is awakened from her sleep due to a beeper page from the prison. Tracey Cornely states that on her job as Unit Management Administrator that she must respond to "signal 3's"/man-down positions at the institute which does include braking up inmate fights, following up with the necessary disciplinary action after such a fight and doing the required documentation of the events leading up to the fight and the resulting injuries. Tracey Cornely reports that on her job she must resolve grievances, make daily rounds of the unit, develop programs, monitor school attendance of inmates, make out work schedules and inspect the 12 living units. Tracey Cornely reports that if she is experiencing a bout of right hip trochanteric bursitis that she is limited in her standing and walking tolerance. Tracey Cornely reports that she has had cortisone injections to [the] right hip from her rheumatologist, Dr. Lee, and Tracey Cornely reports that since her diagnosis of Lupus in 2000, she has had approx. 6 to 8 cortisone injections to her right hip.

{¶ 61} Dr. Renneker ultimately concluded that relator was permanently disabled from performing the essential job duties of a unit management administrator stating:

In summary, I am in agreement with the above physician opinions that Tracey L. Cornely is permanently and totally disabled from performing the essential job tasks of a Unit Management Administrator due to the stress of that job, the 24/7 on-call nature of that job and due to the likelihood that the stress, long hours, 24 hour on-call nature of her job as a Unit Management Administrator is likely to result in a flare-up of her Lupus and/or a flare-up of her Lupus-related severe headaches. Of note, Tracey Cornely scored 62 points, or a severe pain impairment, related to her chronic headaches per 5th Edition of the AMA Guides to the Evaluation of Permanent Impairment on this date.

In summary, it is my medical opinion that Tracey L. Cornely is permanently and totally disabled from performing the essential job tasks of a State of Ohio Marion Juvenile Correctional Institute Unit Management Administrator and she should be permanently retired from that job.

{¶ 62} 21. Thereafter, the medical evidence was reviewed by medical advisors A. Smith and M. Mast who both concluded that there was insufficient objective evidence of permanent disability due to Systemic Lupus Erythematosus.

{¶ 63} 22. In a letter dated June 15, 2011, relator was notified that the Ohio Public Employees Retirement Board ("board") had determined that she was not permanently disabled from the performance of her duties as a unit management administrator and that the decision to terminate her disability benefits had been upheld.

{¶ 64} 23. On June 22, 2011, relator filed a request for re-opening of her disability claim file in light of PERS' failure to refer her for an independent psychological examination. Because she had submitted psychological reports from Drs. Richetta and Kausch, relator maintained that PERS was required to refer her for an independent psychological evaluation. Relator also asserted that Dr. Cannell was not given a full description of relator's actual job duties as a unit management administrator.

{¶ 65} 24. In a letter dated July 22, 2011, relator's request to re-open her claim file was denied. Specifically, relator was informed that the board's medical consultants did not believe that further examination by a psychiatrist or other physician was warranted, otherwise one would have been conducted. Further, while acknowledging that Dr. Cannell's original report considered the wrong job description, PERS informed relator that Dr. Cannell was, thereafter, to provide the proper job description and his opinion that she was not permanently disabled.

{¶ 66} 25. Counsel for relator then requested that Dr. Cannell be provided not only the official job description for relator's position as a unit management administrator, but that he be informed of her actual job duties while serving in that position. Relator asked that Dr. Cannell thereafter provide another addendum report.

{¶ 67} 26. In a letter dated September 6, 2011, relator's request was denied.

{¶ 68} 27. Thereafter, relator filed the instant mandamus action in this court.

Conclusions of Law:

{¶ 69} In this mandamus action, relator contends that PERS abused its discretion in the following ways: (1) failing to provide the independent medical examiner with a description of her job as a unit management administrator which accurately reflected her day-to-day obligations and responsibilities; (2) failing to have relator examined for the

psychological condition diagnosed by Drs. Richetta and Kausch; and (3) failing to have her additional medical evidence which she submitted reviewed by an independent medical examiner.

{¶ 70} It is this magistrate's decision that PERS did abuse its discretion by failing to provide Dr. Cannell with a description of relator's job which accurately reflected her day-to-day obligations and responsibilities. However, the magistrate finds that the commission did not abuse its discretion by refusing to have relator examined for psychological conditions and did not abuse its discretion by relying on its medical consultants to review her additional information.

{¶ 71} Mandamus is the appropriate remedy where no statutory right of appeal is available to correct an abuse of discretion by an administrative body. *State ex rel. Pipoly v. State Teachers Retirement Sys.*, 95 Ohio St.3d 327, 2002-Ohio-2219. Because there is no statutory appeal from the board's determination that relator is not entitled to disability benefits, mandamus is an appropriate remedy. *Id.*

{¶ 72} In order to prevail on her complaint, relator must demonstrate that she has a clear legal right to the relief requested, that PERS has a clear legal duty to provide the requested relief, and that relator has no plain and adequate remedy in the ordinary course of the law. To be entitled to the requested writ of mandamus, relator must establish that the board abused its discretion by denying her request for disability benefits. *State ex rel. Mallory v. Pub. Emp. Retirement Bd.*, 82 Ohio St.3d 235, (1998). An abuse of discretion connotes a board decision that is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 220 (1983). When there is some evidence to support the board's decision, an abuse of discretion has not been shown. *Id.* Further, in *Pipoly*, the Supreme Court of Ohio refused to impose, in the absence of a statutory duty, any requirement that the decision to deny benefits be explained.

{¶ 73} Pursuant to R.C. Chapter 145, disability benefits are payable when it is determined that the member is mentally or physically incapacitated from the performance of duty by a disabling condition either permanent or presumed to be permanent. A disability is presumed to be permanent if it is expected to last for a continuous period of not less than 12 months following the filing of the application. Ohio Adm.Code 145-2-21(A)(1) defines "disability" as the "presumed permanent mental or physical incapacity

for the performance of a member's present duty or similar service that is the result of a disabling condition that has occurred or has increased since an individual became a member."  The physician who conducts the medical examination considers whether the member's present condition renders the member incapable of performing their job duties as a result of the disabling condition.

{¶ 74} Relator applied for disability benefits under R.C. 145.35 and Ohio Adm.Code 145-2-21.  Relator's treating physician, Dr. Hebert, had diagnosed her with Lupus which is also identified as SLE.  In his August 12, 2008 report, Dr. Hebert noted that it was well known that stress was a trigger for Lupus and that her job as a unit management administrator had put her under too much stress.  In his July 8, 2008 report, Dr. Hebert noted that relator had experienced a dramatic improvement in her condition since she had been on a leave of absence.

{¶ 75} The board had relator examined by Dr. Irwin who agreed with Dr. Hebert's conclusion that relator was unable to continue to work at her job and was totally and permanently disabled.  In his September 9, 2008 report, Dr. Irwin described relator's job as a unit management administrator as follows:

> She has a chronic history of systemic lupus erythematosus manifested primarily by arthralgias, proteinuria and with recurring narcotic resistant headaches. Although she has taken Triptan drugs for migraine headaches as well they generally do not control the lupus related headaches, which are quite frequent and sever. I've reviewed her job description, which requires her to be on-call 24 hours per day, seven days a week as a unit management administrator for a juvenile corrections facility. She is frequently called when she is away from her scheduled hours at the facility and at times has had to return to the facility. This stress has tended to precipitate more frequent episodes and also when she has a headache it makes her handling the duties effectively essentially impossible. Her physicians that follow her for the lupus feel the job situation is detrimental to her health and can contribute to progression of the lupus as well.

Because Dr. Irwin agreed, PERS approved relator's disability application.

{¶ 76} Because R.C. 145.36 provides that, unless waived by the board, disability recipients must undergo annual medical examinations by an examining physician or a

physician selected by the board, PERS had relator examined by Dr. Woskobnick.  At the outset of his report, Dr. Woskobnick described relator's job duties as a unit management administrator as follows:

> Ms. Cornely relates a history of having systemic lupus erythematosus diagnosed 8-1/2 years ago. She sees a rheumatologist in Columbus, Dr. Catherine gastroesophageal reflux disease. She currently is working about 25 hours a week running a college program in the Marion Technical College associated with the Marion Prison System. She has a history of lupus nephritis. She has chronic fatigue related to her illness. When she last worked full time hours was at a juvenile correction facility in Marion where she is on call 24/7 and received phone calls in the middle of the night and lots of additional hours. This would cause stress, fatigue, promote headaches that caused cognitive problems and caused exacerbation of her underlying lupus.

{¶ 77} Thereafter, Dr. Woskobnick concluded that she remained disabled because her former job would not permit her to have a regular straight schedule and would prevent her from having any flexibility into her schedule.

{¶ 78} Because PERS' medical consultants agreed with Dr. Woskobnick's determination, relator's disability benefits were continued.

{¶ 79} The following year, PERS again had relator examined, this time by Dr. Cannell.  The parties are all in agreement that, when he rendered his January 4, 2011 report, Dr. Cannell did not consider whether she was disabled from her position as a unit management administrator; instead, he considered her current position as a coordinator for Marion Technical College where she was working 24 hours per week.  Dr. Cannell concluded that relator's lupus would not prevent her from returning to that job.

{¶ 80} Thereafter, Dr. Cannell was provided with the official department of administrative services' job description for relator's position as a unit management administrator.  That official form indicates that it is a 40 hour a week job and makes no mention of the fact that relator was on-call 24/7.  Dr. Cannell reviewed the official job description and spoke with relator.  In his February 25, 2011 report, Dr. Cannell did indicate that relator had informed him that there were days that she would work longer hours than usual and days when she would be called at various hours to address various

issues.  After reviewing the official job description and speaking with relator, Dr. Cannell again opined that relator was not permanently disabled from her job as a unit management administrator.

{¶ 81} Relator appealed and, as required by Ohio Adm.Code 145-2-23(B)(3)(d), relator submitted additional objective medical evidence which had not been previously considered by the retirement board.  This evidence included the psychological reports of Drs. Richetta and Kausch.  PERS' medical consultants considered this additional medical information and recommended that the decision to terminate relator's disability benefits should be upheld.

{¶ 82} R.C. 145.35(E) provides:

> Medical examination of a member who has applied for a disability benefit shall be conducted by a competent disinterested physician or physicians selected by the board to determine whether the member is mentally or physically incapacitated for the performance of duty by a disabling condition either permanent or presumed to be permanent.

{¶ 83} PERS argues that it did provide Dr. Cannell with the official department of administrative services' descriptions of relator's job.  PERS asserts that it must have the discretion to rely on the official job description provided by the department of administrative services and that it is "not equipped to resolve claims that an employee's past duties did not correspond to the official job description" and further asserts that Dr. Cannell's telephone conversation with relator was sufficient.  (Respondent's brief, at 19.) This magistrate disagrees.

{¶ 84} After reviewing the official job description, it is apparent that the department of administrative services' official job description for relator's position as a unit management administrator did not, in fact, include the most stressful aspects of her job.  As is apparent from the certified record of proceedings, relator's job required her to be on-call 24/7, that she receive phone calls in the middle of the night, that she worked more hours and her schedule was irregular and that she was also called upon to intervene in inmate fights and follow up with the necessary disciplinary action thereafter.  All of the physicians whose reports are contained in the certified record of proceedings agree that

stress causes Lupus to flare up. As such, all the physicians recommend that relator reduce the amount of stress in her life and that she cannot perform an overly stressful job.

{¶ 85} Relator cites this court's decision in *State ex rel. Leedy v. School Emps. Retirement Sys.*, 10th Dist. No. 04AP-473, 2005-Ohio-1764, in support of her argument. While this case involved the state employees retirement system, the discussion and rationale of this court applied to PERS as well. In that case, Mervin E. Leedy had been employed as a custodian with the Lima City School System. On his application for disability benefits, Leedy described his job as follows:

> Custodian = unloads trucks, lift computer paper boxes & copy machine paper boxes. Move boxes for [administration] secretaries up and down stairs. Sweep, mop, buff, etc.

*Id.* at ¶ 8.

> Leedy's treating physician diagnosed him with:
>
> "Connective Tissue Disorder," "Chronic Pain Disorder," and "Small Fiber Peripheral Neuropathy."

*Id.* at ¶ 9.

{¶ 86} School Employees Retirement System ("SERS") had Leedy examined by Dr. Nancy M. Vaughan who concluded:

> His job as a custodian involves frequent heavy lifting of supplies and furniture. This is difficult with a connective tissue disorder which waxes and wanes. Strenuous lifting during an acute flare can worsen the myopathic condition. It is my opinion that he is not physically capable of performing his duties as a custodian due [to] his connective tissue disorder. His small fiber neuropathy is causing pain and autonomic symptoms, but itself is not disabling.

*Id.* at ¶ 13.

{¶ 87} SERS referred Leedy for an annual medical examination. It is undisputed that SERS failed to provide the examining physicians with a copy of Leedy's job description. SERS determined that his disability benefits should be terminated.

{¶ 88} Leedy filed a mandamus action and this court adopted the decision of its magistrate and granted a writ of mandamus.  With regard to the failure of SERS to provide the examining physician with a job description, the court's magistrate stated:

> Second, relator correctly asserts that SERS failed to provide the examining physicians with a copy of his job description. As such, it appears that only Drs. Downhour and Renneker actually had the formal job description from the Lima City School District regarding the physical demands of relator's work. One could argue that all custodial jobs are similar enough that lifting requirements would apply across the board. However, the magistrate finds that such a determination ignores the differences in work settings among different jobs. Furthermore, pursuant to R.C. 3309.39, the question is whether or not the person is incapacitated from the performance of their last assigned primary job duty as an employee by a disabling condition which is either permanent or presumed to be permanent for 12 continuous months following the filing of an application. In order to make such an assessment, the magistrate finds that the physicians must be aware of the employee's last assigned primary duties as an employee. A general description of custodian does not suffice. For this additional reason, the examining physicians should be asked to reissue their reports in light of actual knowledge of relator's job duties.

*Id.* at ¶ 50.

{¶ 89} PERS argues that the Leedy case is not applicable here because here PERS did provide Dr. Cannell with the official department of administrative services description of relator's job.  The problem with relator's argument is that the certified record of proceedings indicates that the official job description is incomplete and does not include relator's most stressful job responsibilities.  Because it is undisputed that stress exacerbates relator's lupus and causes it to flare up, it is imperative that the examining physician have a full understanding of the amount of stress involved in relator's working conditions.  Here, it is clear that Dr. Cannell did not.  While Dr. Cannell did have a telephone discussion with relator, he only indicates that he was now aware that there were days she would have to work longer hours than usual and that she would be called at various hours to address different issues.  This does not thoroughly explain relator's

additional job duties.  Further, nowhere in Dr. Cannell's report does he indicate that he reviewed any of the other medical evidence in the record.  As such, there is no evidence from which it could be concluded that Dr. Cannell actually was aware of relator's actual job duties.  Further, to the extent that PERS argues that its medical consultants were aware of relator's actual job duties, the magistrate finds that is not sufficient.  PERS must rely on medical evidence which constitutes "some evidence."  Since Dr. Cannell's report does not constitute "some evidence" with which the medical advisors could agree, this argument fails.  While, as a general rule, providing examining physicians a copy of an official job description should suffice, it does not suffice where the official job description does not accurately reflect the job duties involved.

{¶ 90} Relator also contends that PERS abused its discretion when it did not have her examined for psychological conditions.  Relator contends that, because she submitted the psychological reports of Drs. Richetta and Kausch, who opined that her psychological condition prevented her from returning to her job, R.C. 145.35(E) obligated PERS to have her examined by a physician who could ascertain the psychological impact of her lupus on her ability to perform her previous duties as a unit management administrator.

{¶ 91} PERS argues that it is not required to order an independent medical examination to address an entirely new diagnosis raised for the first time on appeal and that, if its medical consultants, Drs. Smith and Mast, would have determined that a new medical examination was necessary, they would have recommended one.  PERS argues that it fully complied with the statutory and administrative requirements and did not abuse its discretion.

> As noted previously, R.C. 145.35(E) provides:
>
> Medical examination of a member who has applied for a disability benefit shall be conducted by a competent disinterested physician or physicians selected by the board to determine whether the member is mentally or physically incapacitated for the performance of duty by a disabling condition either permanent or presumed to be permanent.

{¶ 92} In making an application for a disability benefit, Ohio Adm.Code 145-2-21(B)(1) provides:

Consideration of a member's application shall be limited to the disabling condition(s) listed in the application or disclosed by the examination of the physician(s) selected by the retirement system and the report of attending physician(s) on a form provided by the retirement system.

{¶ 93} It is undisputed that relator's application listed lupus as the condition disabling her from her job. Further, as the medical evidence indicates, stress causes the condition of lupus to flare-up.

{¶ 94} After PERS initially determined that her disability benefits would be terminated, relator submitted the additional objective medical evidence as required by Ohio Adm.Code 145-2-23(B)(3)(d). Thereafter, Ohio Adm.Code 145-2-23(C) provides that the following action must be taken thereafter:

(1) After submission of any additional medical evidence as described in paragraph (B)(3)(d) of this rule, all evidence shall be reviewed by the retirement board's medical consultant(s) who shall recommend action for concurrence by the board.

{¶ 95} In the present case, after relator submitted her additional medical evidence, including the reports of Drs. Richetta and Kausch, medical consultants Drs. Smith and Mast determined that there was insufficient objective evidence to support disability due to lupus.

{¶ 96} Relator's argument is that she is now asserting that two conditions were causing her to be disabled: lupus and psychological factors affecting medical condition.

{¶ 97} In the present case, stress is the psychological factor which affects relator's medical condition of lupus. In his April 12, 2011 report, Dr. Richetta identifies the psychological factors affecting relator's physical condition as follows: "Stress-Related Physiological Response." Dr. Richetta notes further that relator "will never be able to work a position which causes her undue emotional stress." Dr. Kausch's report notes the same; in fact, he indicates that her lupus symptoms are increased when she is "stressed." He notes that her prognosis is "stable with Lupus as long as she avoids stress." He concludes that she is unable to return to her former position as a unit management administrator "because the stress from that job activated her Lupus."

{¶ 98} All the physicians who examined relator concur that her condition is triggered and exacerbated by stress. The reports of Drs. Richetta and Kausch simply indicate that stress is the psychological factor which affects her physical condition of lupus. The magistrate agrees with PERS' argument that its medical consultants would have recommended additional medical evaluations if those evaluations would have been necessary or even helpful for PERS to render its decision. Here, the magistrate agrees that additional medical evaluations from a psychiatric point of view were not necessary.

{¶ 99} Relator's final argument is that PERS was required to have her additional medical evidence submitted and reviewed by an independent medical examiner. The magistrate disagrees. As indicated previously, Ohio Adm.Code 145-2-23(C)(1) provides:

> After submission of any additional medical evidence as described in paragraph (B)(3)(d) of this rule, all evidence shall be reviewed by the retirement board's medical consultant(s) who shall recommend action for concurrence by the board.

{¶ 100} In the present case, PERS' medical consultants reviewed the additional evidence and concluded that she was no longer disabled. PERS did not abuse its discretion in this regard.

{¶ 101} Based on the forgoing, it is this magistrate's decision that this court should issue a writ of mandamus. Although the magistrate finds that the board did not abuse its discretion by failing to have relator examined for a psychological condition and did not abuse its discretion by failing to have her additional medical evidence evaluated by an independent medical examiner, the magistrate does find that the board abused its discretion by failing to provide Dr. Cannell with a job description which included all of relator's obligations and responsibilities. Because Dr. Cannell did not have a complete understanding of the most stressful aspects of relator's job as a unit management administrator, the magistrate finds that his report did not constitute some evidence upon which PERS could rely. Inasmuch as that is the only evidence in the record that relator could return to her position as a unit management administrator, PERS did not have evidence in the record upon which it could rely to terminate her benefits. The magistrate recommends that PERS be ordered to have relator evaluated by a new medical examiner,

not Dr. Cannell, and PERS must provide that medical examiner with an accurate description of relator's day-to-day responsibilities and obligations.


/s/ *Stephanie Bisca Brooks*
STEPHANIE BISCA BROOKS
MAGISTRATE


## NOTICE TO THE PARTIES

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).